## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHERYL PELPHREY-WEIGAND, | : | |
| | : | |
| | : | |
| *Plaintiff,* | : | |
| v. | : | 2:24-cv-01325 |
| | : | |
| RESOURCES FOR HUMAN | : | |
| DEVELOPMENT, INC. *d/b/a* | : | |
| MONTGOMERY COUNTY RECOVERY | : | |
| CENTER, | : | |
| | : | |
| *Defendant.* | : | |

## MEMORANDUM

### I.    Introduction

At the time of her termination, Plaintiff Cheryl Pelphrey-Weigand was a 64-year-old, Caucasian woman, raised in the Mennonite tradition. She was hired in September of 2022 as an Assistant Director/Clinical Supervisor with Defendant Resources for Human Development, Inc. (RHD) at its Medication Assisted Treatment Center in Norristown, Pennsylvania, which treats individuals who are in recovery from narcotics addiction. During her employment, Plaintiff was effectively second in command at RHD, reporting only to Teresa (Terry) Meckley, the Program Director. According to Plaintiff, her tenure with RDH was rife with incessant mistreatment, discrimination, retaliation, and unlawful mismanagement. *See generally* Pl.'s Compl. Ultimately, RDH, through Mackley, took the position that Plaintiff's performance did not meet organization standards. Plaintiff was ultimately terminated in October of 2023 for poor performance.

1

In May of 2025, Plaintiff filed an Amended Complaint against Defendant Resources for Human Development, Inc. (RHD) asserting *fifteen* state and federal claims, sounding in unlawful discrimination as well as whistleblower and retaliation claims. RHD filed a timely Answer and moved for Summary Judgment. In October of 2025, based on the breadth of discrimination asserted by Plaintiff, the Court held oral argument. At argument, the Court instructed the parties to address each argument individually. Before this Court are RHD's Motion for Summary Judgment (Dkt. 39), Plaintiff's Response in Opposition (Dkt. 42), and RHD's reply to Plaintiff's response (Dkt. 47). For the following reasons, Defendant's Motion is granted.

The breadth of Plaintiff's claims requires a disjointed and nonlinear recitation of pertinent facts. Accordingly, instead of presenting the background up front, the Court will introduce the critical facts in this matter as it addresses Plaintiff's particular claims. But first, a note on the presentation of Plaintiff's claims, generally.

## II.    Kitchen Sink Pleading

This Court wishes to first address the nature of Plaintiff's Complaint in this case. In her Complaint, Plaintiff claims that she was the victim of discrimination on the basis of : (1) age; (2) disability; (3) worker's compensation status; (4) race; (5) religion; (6) refusal to violate the FMLA; (7) refusal to violate the APSA; (8) whistleblower status; and (9) refusal to commit an unlawful act. Plaintiff's Complaint brings as astounding *fifteen counts* with at least *nine unique theories* of discrimination plus a wage claim. As this Court will explain, *infra*, this sort of pleading raises serious concerns under Rule 11 and creates a significant burden on the judiciary.

### a.  Twombly, Iqbal, and Rule 11

Based upon *Twombly, Iqbal*, and the Third Circuit's expansive library of decisions interpreting those precedents, plaintiffs in federal court are well on notice that they are required to plead specific facts which, if true, would support their cause of action. The pleading must raise that cause of action up to the threshold of *plausibility*, rather than mere mathematical possibility. Conclusory allegations, including those which may not appear at first to be pure legal conclusions, are set aside for this purpose. Put another way: a plaintiff is not permitted to *guess* they have a claim.

Against that backdrop, Fed. R. Civ. P. 11 provides that upon the signing of a Complaint, counsel is certifying to the Court a belief that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2)-(3).  The Rules also require that these default certifications be made "after an inquiry reasonable under the circumstances. . . ." Fed. R. Civ. P. 11(b).

The Third Circuit has summarized the thrust of Rule 11 as imposing on counsel "a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'" *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 94 (3d Cir. 1988) (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d

151, 157 (3d Cir. 1986)).  Rule 11 requires, therefore, both a "reasonable investigation of the facts and a normally competent level of legal research supporting the presentation." *Lieb*, 788 F.2d at 157.  Rule 11 is intended to discourage pleadings that are "frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith." *Id.* (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir.1986).  There is no subjective good faith safe harbor. *Id.*  Instead, the test is an objective one of reasonableness. *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir. 1985) (implicitly overruled on other ground).

### b. "Kitchen Sink" Pleadings, generally

As mentioned above, Plaintiff alleges that her employer discriminated against her on almost every protected class imaginable. While an employer so broadly hateful is, perhaps, not impossible, such allegations by their very nature strain credulity to its outer limits.  This approach of "identify all my conceivable protected classes now, figure out which ones they hated the most later," has been rightly decried by both courts and the defense bar as a "kitchen sink" pleading.  A kitchen-sink pleading is so-called as a reference to the phrase "everything but the kitchen sink," meaning everything imaginable.  In employment law terms, it refers to an unfocused complaint which makes various unrelated allegations of discrimination based on a multitude of protected classes. As one District Judge from the Middle District of Alabama observed:

> This all-encompassing contention defies common sense.  It is apparent that what [Plaintiff] and her attorneys have done is to take a kitchen

sink approach—that is, to put before the court all conceivable claims, with the hope that the court would sort and sift through them in search of a colorable one.  This trial strategy is grossly unfair to the court and all other litigants who come before it.  For, the inordinate amount of time the court has had to spend sorting through [Plaintiff's] claims has been time unavailable to analyzing other claims and fashioning relief for other individuals, many of whom may truly have been the victims of serious wrongs.   [Plaintiff's] attorneys, not the court, have the responsibility of weeding out frivolous and questionable claims.  Her attorneys should have presented to the court only those claims which they believe presented colorable allegations of wrongdoings.  They, not the court, should sift through her allegations and determine whether she has been the victim of discrimination and, if so, of what type and for what acts.

The court understands that a person can be a victim of pervasive and multiple types of discrimination.  But this understanding has reasonable limits and is not an invitation to abuse. Lawyers have an obligation, just as much as judges, to make sure that these limits are respected.  When lawyers fail to meet this obligation they fail to live up to the oath they took as officers of the court.  Indeed, courts cannot function as delivers of justice—they cannot give all cases the fair and careful and expeditious consideration each one deserves—when they are burdened with cases such as this one.

*Malladi v. Brown*, 987 F. Supp. 893, 900-01 (M.D. Ala. 1997). *See also Gray v. Walgreens Boots All., Inc.*, No. 23 CV 11441, 2024 WL 2863332, at *8 (N.D. Ill. June 6, 2024) (dismissing complaint despite some potentially meritorious claims being buried within it because the Complaint "is the kind of vague, confusing, and 'kitchen sink'" approach which warrants dismissal regardless); *Corley v. Delta Air Lines, Inc.*, No. 1:20-CV-4732-SCJ-CMS, 2021 WL 12300064, at *2 (N.D. Ga. Dec. 9, 2021) (observing kitchen-sink approach and dismissing complaint as impermissible shotgun pleading);  *Wright v. Barr,* No. 17-CV-1081 (EGS/GMH), 2020 WL 13598000, at *22 (D.D.C. June 8, 2020), report and recommendation adopted sub nom.  *Wright*

*v. Garland*, No. CV 17-1081 (EGS/GMH), 2022 WL 17584011 (D.D.C. Dec. 12, 2022)

(noting kitchen sink approach is "widely disapproved"); *Torres v. Miami-Dade Cnty.*,

No. 15-24013-CIV, 2017 WL 364327, at *2 (S.D. Fla. Jan. 25, 2017) (noting that using

the kitchen sink approach creates a "pleading deficiency" and a "tangled mess of

allegations"); *Laincy v. Chatham Cnty., Ga.*, No. CV409-098, 2010 WL 4553447, at *1

(S.D. Ga. Nov. 3, 2010) ("Simply asserting a multitude of claims falling within this

Court's jurisdiction without properly asserting facts is not a best practice."); 

*Stephens v. Thomas Pub. Co.*, 279 F. Supp. 2d 279, 281 (S.D.N.Y. 2003) (noting that

kitchen sink Complaint and opposition to summary judgment motion increases

difficulty of the task before the Court in resolving such a motion).  This Court has

previously criticized this approach in the context of a *pro se* litigant bringing claims

related to credit reports. *See Anderson v. First Premier Bank, et al.*, No. 25-CV-5502,

2025 WL 3214776, at *6 (E.D. Pa. Nov. 17, 2025) (Weilheimer, J.).

While far from ideal, some plaintiffs will begin with a kitchen sink complaint

which is just barely strong enough to survive a motion to dismiss, with the intent and

expectation of taking fact discovery to figure out which claims have legs and abandon

the ones that don't.  This "strategic retreat" approach may still run afoul of Rule 11,

understood in the context of *Twombly* and *Iqbal*, as was explained above.  But district

courts have responded positively when plaintiffs avoid compounding that initial

pleading mistake by agreeing to narrow their claims after discovery.  *E.g., Robb v.

Rollins*, No. 20-CV-929 (GMH), 2025 WL 1025084, at *1 (D.D.C. Apr. 7, 2025) (noting

that plaintiff "[s]ensibly" narrowed her claims at summary judgment after initially filing a kitchen sink complaint).

This Court has significant doubts that any but the most specific and meritorious "kitchen sink" complaint could possibly clear the bar set collectively by *Twombly*, *Iqbal*, and Rule 11. Absent extreme circumstances supported by specific factual allegations, this Court questions whether it is even possible for a barred attorney to truly find it plausible enough to pass Rule 11 muster that a given defendant employer had animus towards (or tolerated a hostile work environment regarding) *nine* different (largely unrelated) protected classes. This Court observes that an experienced employment attorney who is diligently stopping, looking, and listening would find it unlikely that such vague and broad allegations of discrimination can plausibly be alleged so as to justify submission to a federal court. In the rare case where an individual has indeed been the victim of nine unique and simultaneous types of discrimination, it is not asking too much of a Plaintiff's lawyer to spend serious time in drafting a pleading which captures enough specifics to set it apart from the type of kitchen sink pleadings which sound in bad faith litigation tactics or represent unsupported paranoia from the plaintiff.

The bench and bar would benefit from additional Third Circuit authority which discourages such pleadings or makes observations similar to the above. Such a decision may give the District Courts more leeway to marshal the allegations before it - in the rare case where such facts do, indeed, exist- and dismiss outright where there are no such facts. But as the law stands, district courts have no choice but to

carefully sift through the record evidence and arguments for each and every claim that has been thrown in with the kitchen sink.

### c. The Complaint in this case is a "kitchen sink" complaint, and Plaintiff has made no attempts to cure that deficiency

As an initial matter, this Court finds that the Complaint in this case is, indeed, a "kitchen sink" pleading. That was clear from this Court's first review of the allegations with their noticeably meager factual allegations, and has been made even more clear by the weak or nonexistent evidence proffered to oppose summary judgment as to each of the counts in this case. This label was made all the more apt because Plaintiff here, unlike some alluded to above, declined the invitation to narrow the focus after fact discovery. Both in briefing and in oral argument, Plaintiff's counsel affirmed her intention to continue to pursue each and every claim as pleaded in the Complaint.

This Court recognizes that there is no precedent in this Circuit which might allow it to summarily dispense with Plaintiff's claims on the basis of being a kitchen sink pleading. That is, perhaps, the reason many plaintiffs pursue it; while bad form, there are frequently no formal consequences to doing it. Many plaintiffs, in all likelihood, are betting that our overworked courts see the extensive briefing on a lengthy complaint and just throw up the white flag, identifying some vague factual disputes, and leaving it all for a jury to sort out.[1] That same difficulty courts face is

---

[1]     For the sake of clarity, this Court is referring here to neither the specific Plaintiff at bar nor her attorney, but rather making general observations about the motivations which frequently underlie pleadings like the one in this case. This Court has found no reason to believe that this Plaintiff or her counsel was engaging in such gamesmanship.

faced by defendants, who are forced to defend themselves on innumerable unrelated fronts, presenting serious challenges in drafting a cohesive summary judgment brief. Some of those same plaintiffs are likely also betting that this bad faith scattershot approach will drive up expected costs to engage in fact discovery and brief summary judgment by defendant in such a way that it may facilitate a more lucrative pre-discovery settlement offer. At the very least, these sorts of pleadings drive up plaintiff's counsel's lodestar if they are someday awarded attorneys' fees.

This Court will not take the path of least resistance in this case or any like it. To the contrary, this Court has undertaken the process that its sister courts have rightly referred to as laborious and time-consuming, and has carefully analyzed each claim individually, and the record evidence Plaintiff claims supports it. As will be explained, *infra*, this Court has given each claim its due consideration and its due deference at summary judgment, and still found that each one lacks record evidence to establish a genuine issue of material fact.[2]

As a final observation, this Court notes that while each of Plaintiff's claims have been analyzed individually, there still has been practical consequences of the disfavored (and arguably violative) kitchen sink approach in this case. Rather than being able to focus her fact discovery on her two or three best varieties of

---

[2]    Even if one or a few of Plaintiff's claims *did* have merit, that would do nothing to change this Court's characterization of the Complaint as a "kitchen sink" complaint.  The presence of some meritorious claims does nothing to absolve the guilt of numerous asserted unmeritorious claims. Arguably, the existence of claims that do have merit would make the kitchen sink offense worse, as the plaintiff in such a case had no discernible reason to stack claim upon claim.  Further, the existence of a meritorious claim among the morass of a kitchen sink complaint only further aggravates the strain this sort of complaint places on the Court, as it requires the Court to be all the more careful in sifting through the often-confusing allegations of such a complaint.

discrimination claims, Plaintiff has been forced to take and defend discovery on numerous totally-unrelated claims.  Further, while Plaintiff sought, and received, additional pages of briefing to oppose Defendant's motion for summary judgment, dividing 30 pages into nine theories of discrimination as opposed to (for example) her three *best* theories necessarily means she has diluted her focus, leaving most arguments largely underdeveloped. It is likely that this has negatively impacted the coherence and effectiveness of her briefing and oral argument.

Suffice to say that when you throw in the kitchen sink, everything else becomes harder to carry.  That doubtlessly has occurred here.  Each claim, analyzed individually and in the light most favorable to Plaintiff, fails as a matter of law based on the record evidence and legal arguments provided by Plaintiff in her briefing opposing summary judgment.

## III.    Legal Standard

Summary judgment is appropriate "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mann v. Palmerton Area School District*, 872 F.3d 165, 170 (3d Cir. 2017) (citation and internal quotation omitted). A fact is "material" if, under the applicable substantive law, it is essential to the proper disposition of the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party moving under Rule 56 "bears the burden of demonstrating the absence of any genuine issues of material fact. When determining whether there is a triable dispute of material fact, the court draws all inferences in favor of the non-moving party." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820-821 (3d Cir. 2006) (citations and internal quotation omitted).

The movant's initial burden does not relieve complainant's obligation of producing evidence that would support a jury verdict. *Anderson*, 477 U.S. at 256. Because a motion for summary judgment looks beyond the pleadings, the opposing party must advance specific facts showing that there is a genuine factual dispute. *See Marshall v. Sisters of Holy Family of Nazareth*, 399 F.Supp.2d 597, 598 (E.D. Pa. 2005). The non-movant may not rest on their pleadings but must point to probative evidence tending to support the complaint. *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

If the "evidence presented by the non-movant is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250. "Where the movant is the defendant, or the party without the burden on the underlying claim, the movant has no obligation to produce evidence negating its opponent's case. The moving party merely has to point to the lack of any evidence supporting the non-movant's claim." Brown v. LVNV Funding, LLC, No. CV 24-6412, 2025 WL 2044174,

at *1 (E.D. Pa. July 18, 2025) (Weilheimer, J.) (*citing National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992).

Claims based upon discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.*, are essentially identical, requiring the same proofs and including the same burden shifting, and therefore are analyzed together. *Cf. Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). To make a *prima facie* case for disparate treatment under those statutes, a plaintiff must be able to prove: "(1) the plaintiff belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action despite being qualified; and (4) the action occurred under circumstances that raise an inference of unlawful discrimination." *Anderson v. Mercer Cty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020).

To prevail on a claim for unlawful retaliation under those statutes, a plaintiff must prove: (1) they engaged in conduct that was protected under the relevant statutory provision; (2) the employer took a materially adverse action or a series of materially adverse actions against them; and (3) there was a causal relationship between the protected conduct and the employer's materially adverse response or responses to that conduct. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

Finally, absent a contract to the contrary, employment in Pennsylvania is at will, meaning "[g]enerally, an employer may discharge an employee with or without cause, at pleasure ...." *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998) (cleaned up). Despite this default rule, "courts have forbidden the firing of at-will employees when doing so would offend Pennsylvania's public policy." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003). This exception is construed narrowly. *Id.*

## IV.    Discussion

### a.    Age

The Age Discrimination in Employment Act (ADEA) makes it unlawful to discharge or discriminate against any individual regarding compensation and terms of employment based on that individuals age if that individual is over 40.  29 U.S.C. §§ 621-634; *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643-644 (3d Cir. 2015).  In the absence of direct evidence, allegations that an employee was the object of age discrimination are analyzed under the familiar *McDonnell Douglas* burden-shifting framework.  If a claimant establishes a *prima facie* case, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action.  *Meis v. Aria Health Physician Servs.*, 788 F. Supp. 3d 661, 669 (E.D. Pa. 2025) (Weilheimer, J.).  If the defendant employer successfully meets its burden of production, the plaintiff must present evidence that the employer's proffered reason for its action is pretextual.  *Scott v. Wedge Recovery Ctr.*, No. 23CV4934, 2024 WL 5188042, at *3 (E.D. Pa. Dec. 20, 2024) (Beetlestone,

C.J.).  Here, RHD concedes that Plaintiff has established a prima facie case under the burden-shifting standard in her claim under the ADEA and the PHRA.

In a scattershot approach, Plaintiff asserts that she was made to feel inferior because of her age by other members of the management team.  Specifically, Plaintiff alleges that Office Manager Donna Bartram made several mean comments towards her, stating that she was "too old," "stuck in her ways," and that she should just retire. Plaintiff further alleges that younger staff joined in on these comments and that the ideas of younger staff were platformed over Plaintiff's own, similar ideas.  *See* Am. Compl. at 4-5; Pl.'s Br. in Opp'n, at 8-9.  One of Plaintiff's many theories is that these comments amount to age discrimination and that no investigation was done, despite, Plaintiff's Complaints.

There are a few problems with this theory of the case.  First, the principal perpetrator according to Plaintiff was Bartram who is not Plaintiff's superior, nor the decision maker in this case.  Next, Plaintiff stated in her deposition that the only person she told about this perceived agism was her supervisor, Terry Meckley.  Pl.'s Dep. at 263-264.  Plaintiff further testified that Meckley spoke with Bartram and that Bartram's behavior changed.  *Id.* at 264-265.  She also stated that Meckley took steps to bolster morale and change the culture, including engaging multiple third-parties for team building.  *Id.*

What's more, RHD has advanced a fulsome record with respect to Plaintiff's failures to satisfactorily discharge her duties.  Plaintiff's failures include repeated instances, after direction from Meckley, to supervise counselors under her charge

whose productivity was lacking.  On February 3, 2023, Meckley issued Plaintiff a first written warning and plan of correction.  This warning, related to several complaints from other RDH staff members, included allegations that Plaintiff: (1) confronted a counselor by yelling and banging hands on a desk; (2) failing to follow clinic procedures and policies during patient dosing hours; (3) confronted a nurse by yelling in the lobby where persons served were located; and (4) failed to meet with supervisees on a monthly basis.  Meckley Decl. at Ex. 4.

Roughly one month later, in April of 2023, Meckley issued Plaintiff a second written warning.  That warning documented the following:

> Program Director was alerted to a concern regarding two IC notes [ ] that were signed/completed by Cheryl but actual sessions and notes were written by patients primary counselor, Cynthia.  Both notes had been sent for billing with erroneous signatures. Compliance department was notified.  Cheryl was informed that an investigation would be opened and she was instructed not to change/adulterate the notes until further instruction were given by compliance.  This directive was not followed as it was observed by the [Program Director] that the notes had again been opened/unsaved the following day.

*Id.* at Ex. 5.  On August 8, 2023, Meckley issued a final written warning outlining several missed deadlines and several billing/auditing inaccuracies.  *Id.* at Ex. 6. Critically, this final written warning observed that missed auditing and/or patient access deadlines place the program's license, credentialling, and funding at risk.  *Id.* In between each of these written warnings were regularly scheduled "supervisions" where Meckley and Plaintiff discussed Plaintiff's performance.

On August 29, 2023, Meckley emailed Human Resources and Regional Director Michele Kenny (Kenney) about continued concerns regarding Plaintiff's performance.

Kenny Decl. at ¶ 10.  Specifically, Meckley addressed Plaintiff's failure timely review billing and her failure to supervise and address productivity issues with two counselors under her charge.  *Id.* at Ex. 4.  Notably, one of those counselors verbalized to Meckley that scheduled supervisions between she and Plaintiff had not actually occurred – suggesting that written documentation of the same was likely misrepresentative of their completion.  *Id.*

That same month, RHD suspended Plaintiff after a patient made a complaint about an interaction between Plaintiff and the patient.  After an investigation Meckley and Kenny determined that the complaint was unfounded.  Meckley Decl. at ¶ 23; Kenny Decl. at ¶ 11.  In September Meckley contacted Plaintiff to discuss the scheduled return date of October 2, 2023.  Upon Plaintiff's arrival on the morning of October 2, 2023, Meckley terminated Plaintiff's employment.

Against this backdrop, this Court finds Defendant has carried its burden in establishing a legitimate non-discriminatory reason for Plaintiff's termination.  In response, Plaintiff has failed to carry her burden to establish a pretextual disguise for invidious age discrimination.  None, but Bartram herself, dispute that insensitive comments were made at Plaintiff's expense.  However, Plaintiff has not pointed to any credible evidence that Bartram's perceived animus in any way influenced Meckley's decision to terminate Plaintiff, or that Meckley ever made derogatory, agist remarks towards Plaintiff.  In fact, Meckley made the decision, certainly aware of Plaintiff's age, to hire Plaintiff in the first place.  *See* Pl.'s Dep. at 269.  Although, our Third Circuit Court of Appeals has declined to treat "same actor" evidence as

presumptive in ADEA claims, courts are still permitted to consider it as an important indication of the unlikeliness of the same decision maker firing a plaintiff for a reason that was plain at the time of their hiring. *Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 644 n.97 (E.D. Pa. 2021) (Kearney, J.). The record evidence demonstrates that Plaintiff's ongoing performance issues, including issues that could put the licensure of the entire recovery center at risk, are the animating factors in Plaintiff's termination. Accordingly, RHD is entitled to summary judgment on Counts 1 and 12 for age discrimination.

### b. Disability

Plaintiff also alleges that RHD failed to accommodate her disability and ultimately terminated her employment because of the same. A claimant can establish discrimination under the ADA by way of either a pretext theory or a mixed-motive theory. Under a pretext theory, Plaintiff must establish: (1) that she has a disability as defined by the ADA; (2) she is a qualified individual and could perform the essential function of the position; and (3) her disability was a determinative factor in the adverse employment decision. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). The traditional *McDonnell Douglas* paradigm also applies to the pretext theory of ADA discrimination.

In a mixed-motive case, a plaintiff must prove that her protected status was a motiving factor in the employer's decision making-process. A claimant may do this by proffering "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance" on the plaintiff's protected status. *Brown v. J.*

*Kaz, Inc.*, 581 F.3d 175, 183 (3d Cir. 2009).  This may be done through examples of the decision makers making statements that reflect a discriminatory attitude.  *Id.* Under either theory, Plaintiff must demonstrate a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or that they are regarded as having such impairment.  *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 (3d Cir. 2011).

Plaintiff's asserted disability is related to an April 20, 2023 workplace fall that occurred when Plaintiff collided with a patient in a wheelchair and injured her right knee, pelvis, and back.[3]  *See* Pl's Br. in Opp'n 15-16 ("[Plaintiff] is disabled or at the very least Meckley perceived her to be disabled.  As a result of the accident at work, [Plaintiff] suffered serious injuries, which continue to cause her pain"); Pl.'s Dep. at 275-277.  However, this theory of the case is undermined by Plaintiff's own deposition testimony.  One exchange is particularly illustrative:

> Q: Did anybody at RHD make any comments, statements, to you about medical conditions in a derogatory way?
>
> A: I think Donna called me a gimp **one time**.
>
> Q: Is that because you use a cane or is that because of the injury at the fall?
>
> A: Because of the cane … And I don't carry it all the time…
>
> Q: So the ADA claim, we have an -- allegations of – I guess of failure to accommodate, discrimination, retaliation and harassment, but I think you've just told me that nobody said anything to you about -- ?

---

[3]    Notably, when Plaintiff was first asked about her disability claim at her deposition, she stated that it was associated with her Multiple Sclerosis (MS) and not her workplace fall.  Plaintiff's MS is not mentioned a single time in her Amended Complaint, or her Opposition Brief *See* Pl.'s Dep. at 271-272.  **Plaintiff further stated that she did not require accommodations at the workplace because of her M.S.**  *See* Pl.'s Dep. at 273.

A: Other than Donna calling me a gimp.

Q: It was Donna Bartram?

A: It's always Donna Bartram.

Pl.'s Dep. at 282-283.

This Court agrees with RHD that there is simply no evidence in the record that Plaintiff's termination, under a pretext theory or a mixed motive theory, was motivated by her workplace fall or resultant injuries. Assuming, in Plaintiff's favor, that she has established her *prima facie* case, there is no indication that her knee and hip injuries impacted at all Meckley's termination decision. Plaintiff was treated and released to full duty as of June 2023. *See* Pl.'s Ex JJ. Plaintiff's Brief in Opposition, which is generally heavy on legal conclusions and light on record facts, seems to suggest that Meckley questioned Plaintiff's request for leave beyond what was indicated by her Workers Compensation discharge. *See* Pl's Br. in Opp'n at 19. However, Meckley ultimately granted Plaintiff's additional leave. *See* Meckley Decl. at ¶ 19.

Again, this Court sees the far more likely explanation for Plaintiff's termination as her repeated workplace failures described above. There is no evidence that Meckley had any animus towards Plaintiff's injury. In fact, Plaintiff's deposition testimony demonstrates that Meckley was one of the few who helped her when she fell. Pl.'s Dep. at 337-338. Accordingly, RHD is entitled to summary judgment on Counts 2 and 13.

Plaintiff also asserts that RHD denied her an accommodation under the ADA and PHRA. This claim centers around a May 10, 2023, team building cooking demonstration scheduled by Meckley.[4] Plaintiff contends that, due to the workplace injury described above and the standing/sitting restrictions associated with her injures, she was unable to meaningfully participate because the demonstration required staff to stand to see. *See* Pl.'s Compl. at ¶ 97; Def.'s Br. at 15.

To state a failure to accommodate claim, Plaintiff must establish that (1) she had a disability within the meaning of the ADA; (2) RHD had notice of this disability; (3) she can perform the essential functions of her position with reasonable accommodation; and (4) RHD failed to provide an accommodation. *Campo v. Mid-Atl. Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 388 (E.D. Pa. 2021) (Marston, J.). To establish the last element (that RHD failed to accommodate) Plaintiff must prove that (1) RHD knew about the employee's disability; (2) she asked for an accommodation or assistance; (3) RHD did not make a good-faith effort to accommodate the employee; and (4) she could have been accommodated. *Id.*

Again assuming that Plaintiff has established that she had a disability that required an accommodation under the ADA, Plaintiff never requested an accommodation to sit during the team building exercise. Plaintiff attended the event and when she became tired, she began to walk away for the demonstration, at which point a chair was provided for Plaintiff to participate. Pl's Dep. at 278-280.

---

[4] There is some indication that this demonstration was scheduled *before* Plaintiff's workplace injury – preventing Meckley from considering Plaintiff's needs at the time the demonstration was scheduled.

Accordingly, Plaintiff has failed to make out a claim that RHD denied her a reasonable accommodation in Couts 2 and 13.

### c. Religion

Plaintiff alleges, under both a pretext theory and a mixed motive theory, that that RHD terminated Plaintiff's employment because of her religion. As discussed above, the pretext theory is analyzed under *McDonnell Douglas*. To state a *prima facie* case, Plaintiff must first demonstrate that she was terminated under circumstances giving rise to an inference of discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). Plaintiff's Title VII claims similarly fail because RHD has advanced significant evidence demonstrating that the decision maker, Meckley, had a legitimate, non-discriminatory reason to terminate Plaintiff's employment.

Plaintiff's allegations regarding discrimination based on religion seem to center around unkind exchanges between Plaintiff and co-workers Bartram, Brooke Moats, Alex Scharf, and Marisa Palencar. Pl.'s Dep. at 106-107. In one instance, multiple staff were participating in a teambuilding icebreaker exercise where Plaintiff happened to disclose that she was raised Mennonite. In response, Bartram stated that this may explain all of Plaintiff's "peculiarities" and that she "knew [Plaintiff] was weird." Pl.'s Dep at 300-301. Plaintiff's deposition testimony continued:

> Q: …and did she make that statement also noting your religion when she said you were weird?

A: She didn't specifically say because you were raised Mennonite you're weird.

Q: Did you ask her why she would always say that?

A: No

Q: So you're sort of taking [] your interpretation of that she said you were weird, you think that she saying that because she knows you were Menonite?

A: After saying I was peculiar…

Q: Did she make any other comments to you about your religion, or about … being Mennonite?

A: Probably not specifically, just kind of little innuendo about because I don't cuss, I make words up [instead], she cusses all the time…And then shed say things like, well there you go again, you know.

Q: Okay.  Is she making fun of you because you don't cuss[?]

A: Because that's part of the culture … we just don't talk that way … I will warn people, if you hear a cuss word come out of my mouth there's something serious going on.

Q: Okay. Do you --- I know you were aised Mennonite, are you active in the church now?

A: In the Mennonite church, no.  Methodist, yes…

Q: …So did [Bartram] make comments about you being a Methodist?

A: I don't think I ever mentioned the Methodist part.[5]

*Id.* at 301-304.  When asked directly if Meckley (the decision maker in this case) or

any other staff member, ever made a comment about her religion, Plaintiff stated

---

[5]    Here, Plaintiff appears to assert a claim of religious discrimination on behalf of a religion she no longer practices.  Although Plaintiff was raised Mennonite, she is currently a practicing Methodist, and the Complaint contains no allegations of discrimination based on her Methodist faith.  This circumstance raises the interesting question as to whether Plaintiff may properly assert such a claim.  But as this claim fails on the allegations as pleaded, it is not a question this Court need address.

that she did not. *Id.* at 310. For the same reasons discussed above regarding the ADA claims, Plaintiff has no evidence that her religious beliefs were a motivating factor in Meckley's decision to terminate her employment. In fact, by Plaintiff's own admission, Meckely never made any statements or engaged in any conduct that reflected a discriminatory attitude toward Plaintiff based on her religious beliefs. Accordingly, RDH is entitled to summary judgment on Counts 6 and 15.

### d. Hostile Work Environment.

Plaintiff has also asserted Hostile Work Environment Claims related to Counts 1, 2, 6, 12, 13, and 15. The standard of an employer's liability for a hostile work environment depends on whether the alleged harasser is a co-worker or the employee's supervisor with a authority to affect the terms and conditions of the employee's employment. As an initial matter, Bartram and others that are alleged to have been unkind to Plaintiff did not supervise Plaintiff. Thus, Plaintiff's claim must be evaluated consistent with *Vance v. Ball State Univ.* holding that "supervisor" for purposes of vicarious liability is one empowered to take tangible employment actions against the complaining employee. 570 U.S. 421, 424 (2013).

To establish a hostile work environment claim where the actor is not a supervisor, Plaintiff must show: (1) she was subjected to intentional discrimination that was motivated by her protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected Plaintiff; (4) the discrimination or conduct was would detrimentally affect a reasonable person in like circumstances; and (5) management level employees knew or should have known of

the conduct and failed to take prompt an adequate remedial action.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  To determine whether remedial action is adequate the Court must evaluate whether the action was reasonably calculated to prevent further harassment.  *Knabe v. Boury Corp.*, 114 F.3d 407, 412-413 (3d Cir. 1997).  The PHRA evaluates hostile work environment claims through an identical standard.  *Griswold v. Drexel Univ.*, No. CV 22-0568, 2024 WL 921390, at *6 n.8 (E.D. Pa. Mar. 1, 2024) (Quiñones Alejandro, J.)

With respect to Plaintiff's age-related claims, Plaintiff conceded during her deposition that the age comments stopped after she reported them to Meckley.  *See* Pl.'s Dep. at 265-266.  Accordingly, a management level employee took remedial steps, and those steps achieved the desired workplace result.  Thus, RHD is entitled to summary judgment on Plaintiff's age-based hostile work environment claims.

Plaintiff's ADA based hostile work environment claims fail as well.  Plaintiff testified at her deposition that Bartram "called [her] a gimp one time."  *Id.* at 282. This single instance of name calling, while unkind, does not meet the severity or the pervasiveness prong required to establish an actionable claim.  *Lamb v. Montgomery Twp.*, 734 F. App'x 106, 112 (3d Cir. 2018) (affirming summary judgment where claimant was subjected to one incident of harassment overtly based on protected classification).  Separately, there is no record evidence that RHD knew or had reason to know that Bartram called Plaintiff a gimp.  Thus, RHD is entitled to summary judgment on this claim as well.

Plaintiff's hostile work environment claims related to religion similarly fail. Plaintiff only recalled a single incident where her religion was even disclosed, with a single comment in response from Bartram. *See* Pl.'s Dep. at 299-301. And although Plaintiff testified that Bartram would on occasion call her "weird," Plaintiff conceded that these comments were prompted by her largely associated with her manner of speaking as opposed to anything overtly religious. *See* Pl.'s Dep. at 302-303. Finally, while there is some evidence that Meckley may have been present during the initial exchange where Plaintiff disclosed her religious upbringing, Plaintiff never reported the incident to human resources. Accordingly, RHD is entitled to summary judgment on the hostile work environment claims based on religion.

### e. Retaliation

Plaintiff has asserted retaliation claims with respect to her ADEA, ADA and Title VII religious discrimination claims, as well as her Title VII racial discrimination claims and claim under 42 U.S.C. § 1981 for racial discrimination. To establish unlawful retaliation for making internal reports and complaints, Plaintiff must demonstrate that (1) they engaged in protected employee activity; (2) adverse action between the employer either after or contemporaneous with the employee's protected activity and (3) a causal connection between the employee's protected activity and the employer's adverse action. *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015).

As with most of Plaintiff's claims, retaliation claims are viewed through the prism of *McDonnell Douglas*. Accordingly, Plaintiff must establish a causal link

between protected conduct and workplace antagonism. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015). Additionally, plaintiff must demonstrate that the employer's asserted reasons for the adverse employment action are unusually week, presenting inconsistencies, implausibilities or contradictions. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

This Court has already articulated its view that the record evidence, including multiple written warnings documenting complaints against Plaintiff and her failure to complete tasks, was a legitimate non-discriminatory reason for Plaintiff's termination. RHD has carried its burden in objectively establishing that it would have terminated Plaintiff based on her performance alone. Separately, there is no record evidence that Plaintiff made any internal reports or complaints with respect to her age, disability, or religious claims.

Plaintiff's claims for race discrimination (Counts 4, 5, and 14), have a bit more heft, but are still unavailing. Plaintiff alleges that in June of 2023 she was affectionately discussing her son's souped-up muscle car when two of her white co-workers referred to her as a "redneck" and "white trash." Pl.'s Am. Compl. at ¶¶ 41-47. Plaintiff informed HR that she was filing a formal complaint and advised that she would be taking PTO for the next several days as hostility and harassment was affecting her mental health.[6]

What Plaintiff fails to acknowledge is that by June of 2023, she had already received two written warnings for deficient performance and numerous one-on-one

---

[6]    Plaintiff has not made an emotional damages claim as part of her Amended Complaint.

supervisions with Meckley.  Plaintiff completely fails to challenge the believability

with RHD's asserted reasons for her termination.  Confusingly, Plaintiff continues to

maintain that the record evidence shows she completed her all of her required tasks

and that she did not perform her job poorly.  *See* Pl.'s Br. in Opp'n. at 7.  That

assertion ignores the multiple written warnings discussed and cited above.  Plaintiff

simply fails to demonstrate that RHD terminated her employment *because* she filed

a formal complaint.  Accordingly, RHD is entitled to summary judgment on Plaintiff's

race discrimination retaliation claims.

### f. Workers Compensation Retaliation

In Count 3 of her Amended Complaint, Plaintiff contends that her termination

was an act of retaliation in violation of the Pennsylvania Workers' Compensation Act

(PWCA).  77 P.S. § 1 *et seq*.  The PWCA makes it unlawful for an employer to

discharge an at-will employee in retaliation for filing a workers' compensation claim.

*Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 539 (E.D. Pa.

2016) (Beetlestone, C.J.), *aff'd sub nom. Kieffer v. CPR Restoration & Cleaning Servs.,*

*LLC*, 733 F. App'x 632 (3d Cir. 2018).  Thes claims are similarly addressed under the

*McDonnell Douglas* burden shifting framework.  Applying the *McDonnell Douglass*

framework, Plaintiff must show that (1) he engaged in protected activity; (2) he

suffered an adverse employment action either after or contemporaneous with the

protected activity; and (3) a causal connection exists between his protected activity

and the employer's adverse action.  *Id.*  A claimant may establish this causal nexus

by relying on temporal proximity or other circumstantial evidence concerning the employers motivation.  *Id.* at 540.

Here, Plaintiff certainly engaged in protected activity when she filed her claim. Plaintiff was subsequently terminated from her employment for (again) what the Court sees as patently legitimate non-discriminatory reasons.  The temporal proximity between Plaintiff's injury/claim and her subsequent termination does not support her PWCA claim either.  Plaintiff's fall occurred on April 20, 2023 – shortly after her second written warning for performance issues.  Plaintiff was terminated 5 months and 12 days later, on October 2.  Multiple courts across jurisdictions have recognized that the persuasive value of temporal proximity in this context dissipates quickly.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (*citing Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (holding that a gap of 3 months is not indicative of animus or causation).  Accordingly, the 5 month gap in this matter does support causation and Plaintiff has failed to make her *prima facie* case.

Even assuming Plaintiff *had* established a *prima facie* case, Plaintiff had several supervisions and formal warnings predating her fall and workers' compensation claim.  Plaintiff has failed to establish any contradictions in the legitimate reasons RHD has proffered for her termination.  Thus, RHD is entitled to summary judgment on this species of retaliation as well.

### g.  FMLA Retaliation

Plaintiff's Amended Complaint alleges that Meckely ordered her to discipline one of her direct reports (Joanne Beauregard) for taking intermittent leave under the Family and Medical Leave Act. *See* Pl.'s Am. Compl. at ¶¶ 126-130. Plaintiff asserts that when she complained that it was unlawful to discipline the employee for taking FMLA-qualifying leave, she was the target of increased animosity which ultimately led to her termination on October 2.

"When employees invoke rights granted under the FMLA, employers may not interfere with, restrain, or deny the exercise of or attempt to exercise these rights. Nor may employers discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (internal citation and quotation marks omitted). To advance this species of retaliation, Plaintiff must establish that (1) she engaged in protected activity by having a reasonable, good-faith belief that she was ordered to discipline the employee for taking FMLA; (2) she as subjected to a materially adverse action after her protected conduct; and (3) a causal connection exists between the protected activity and RHD's decision to terminate her employment.

This claim, much like the bulk of Plaintiff's Amended Complaint, ignores the reality of the record evidence. Shortly after she was hired, Plaintiff was made aware that Beauregard had productivity issues and that Plaintiff would need to engage Beauregard to address those issues. *Compare* Def.'s Stmt. Undisputed Facts at ¶ 21 *with* Pl.'s Resp. Since December of 2022, it was clear that Meckley's instruction to

supervise and discipline Beauregard was specifically due to her productivity issues – not her lawful use of FMLA. When asked whether she believed she was ever disciplined due to taking FMLA, Beauregard answered "Absolutely not ... I do admit [ ] my productivity was slow." Beauregard Dep. at 42. Beauregard further testified that in March, Plaintiff herself stated that she faced discipline for low productivity. *Id.* at 35-36. In light of Plaintiff's acknowledged understanding that she was instructed to discipline Beauregard for productivity issues, and Beauregard's own view that FMLA was not the reason for this discipline, it is unclear how Plaintiff would have a good faith belief that Meckely was asking her to discipline Beauregard in violation of the FMLA.

Again, assuming for Plaintiff's sake that she did have a good faith belief that Meckley was asking her to issue discipline violative of the FMLA, her termination in October, after she was instructed to discipline Beauregard in March, is not sufficiently proximate to establish a causal connection. *See Leboon, supra.*; *see also Harrison-Harper v. Nike Inc.*, 788 F. App'x 846, 850 (3d Cir. 2019) (clear, documented pattern of performance issues prior to complaints of harassment weigh negatively on causation). Plaintiff herself was on a disciplinary track since February of 2023. Thus RHD is entitled to summary judgment on Plaintiff's FMLA claim as well.

### h. Adult Protective Services Act Retaliation

In Count 8, Plaintiff alleges that her termination, at least in part, was due to retaliation for her reporting to management her concerns that the nursing staff was arbitrarily, unlawfully and improperly withholding life-sustaining medication from

patients and that this amounted to a form patient abuse. *See* Pl.'s Br. in Opp'n at 10.

RHD asserts that this claim is dead in the water, as the Adult Protective Services

Act, 35 P.S. § 10210.101 *et seq.*, does not include outpatient facilities, like the one

RHD operates, in its definitions. Defendant's argument follows that the Act does not

apply in this instance. *See* 35 P.S. § 10210.103.

The Act defines facility in expressly non-exhaustive terms with the proviso

"includes, but is not limited to[.]" *Id.* However, Plaintiff provides absolutely no

argument on this point.[7] The Court will not manufacture an argument on Plaintiff's

behalf for this state law claim. Even if Plaintiff had spotted this issue, she would be

unlikely to overcome the fact that RHD terminated her employment for a legitimate,

non-retaliatory reason as evidenced by her record of warnings and supervisions.

Thus, RHD is entitled to summary judgment on Count 8.[8]

### i. Pennsylvania Whistleblower Act

In Count 9, Plaintiff asserts that she was terminated in violation of the

Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*[9] The statute provides that:

> No employer may discharge, threaten or otherwise discriminate or
> retaliate against an employee regarding the employee's compensation,
> terms, conditions, location or privileges of employment because the
> employee or a person acting on behalf of the employee makes a good
> faith report or is about to report, verbally or in writing, to the employer
> or appropriate authority an instance of wrongdoing or waste by **a public**

---

[7]    As previously mentioned, it is tough to parry even weak arguments when your own filings are overbroad and unfocused.

[8]    Assuming further that Plaintiff had spotted the issue *and* had established some pretextual motive on the part of RHD, this Court would be disinclined to retain jurisdiction over this state law claim absent some other federal basis for jurisdiction.

[9]    The activity that precipitated this alleged retaliation is the same activity that undergirds Plaintiff's Adult Protective Services claim. *See* Pl's Resp. in Opp'n 9-10.

**body** or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a) (emphasis added). The statute defines "public body" as any "body which is created by Commonwealth or political subdivision authority **or which is funded in any amount by or through Commonwealth or political subdivision**[.]" 43 P.S. § 1422 (emphasis added). Accordingly, to maintain this claim, Plaintiff must demonstrate that RHD is a public body within the meaning of the statute. *See Adams v. HCF Mgmt.*, No. CV 18-47, 2018 WL 3388404, at *3 (W.D. Pa. July 12, 2018) ("Plaintiff cannot prevail on her Whistleblower Law claim unless she can demonstrate that HCF is a public body within the meaning of the statute.").

The law in this area is mixed. Defendant appears to concede that RDH receives some public funds due to the heavily regulated nature of its mission and/or Medicaid reimbursements. *See* Def.'s Stmt. Undisputed Facts at ¶¶ 3-5; Def.'s Br. at 20-22. Assuming that some state monies are received by RHD, the Pennsylvania Supreme Court has not specifically passed on whether this alone would make it a public body in the meaning of the statute. *But see Harrison v. Health Network Lab'ys Ltd. Partnerships*, 232 A.3d 674, 677 n.3 (Pa. 2020) (the court acknowledged without deciding that the parties agreed health care provider receiving Medicare funds was a public body within the meaning of the Whistleblower Law). RHD points to a handful of district court cases explaining that "Medicaid reimbursements do not, without more, constitute funding by or through the Commonwealth." *Lampenfeld v. Pyramid Healthcare, Inc.*, No. 3:14-CV-0283, 2015 WL 926154, at *9 (M.D. Pa. Mar. 4, 2015) (cleaned up); *see also Adams v. HCF Mgmt.*, No. CV 18-47, 2018 WL 3388404, at *5

(W.D. Pa. July 12, 2018); *but see Bailer v. Shipley Energy Co.*, 338 A.3d 1026, 1032 (Pa. Super. 2025), *reargument denied* (July 29, 2025) (a recipient of Medicaid funding qualifies as a public body because the law clearly indicates that it is intended to be applied to bodies that receive public money that passes through the Commonwealth.).

Plaintiff's arguments in this regard are relatively undeveloped. Nowhere in her response to RHD's brief does she push back on RHD's contention that its funding regime brings it within the meaning of the Pennsylvania Whistleblower Act.[10] This Court is unwilling to divine nuanced areas of Pennsylvania regulatory law where one or both of the parties has failed to marshal substantive legal support for their claims. *See Wonlah v. Domus, Inc.*, No. 2:24-CV-04725-GAW, 2025 WL 1139268, at *3 (E.D. Pa. Apr. 16, 2025) (Weilheimer, J.). The Court's decision not to wade into this space is buttressed by the fact that Plaintiff was clearly terminated for legitimate, non-retaliatory reasons. Accordingly, RHD is entitled to summary judgment on Count 9.[11]

### j. Pennsylvania Common Law

Count 10 of Plaintiff's Amended Complaint alleges that her firing violated Pennsylvania's public policy prohibiting wrongful termination. Specifically, Plaintiff asserts that she was terminated for her refusal to comply with several illegal acts. Defendant asserts that Plaintiff points to no record evidence of her being required to

---

[10]     This is odd considering Plaintiff's Amended Complaint string cites several cases which she believes speak to this issue. *See* Pl.'s Am. Compl. at ¶ 145. String cites without argument or direction are generally unhelpful, especially when a party brings 15 claims.

[11]     The Court would also be disinclined to retain jurisdiction over this state law claim absent some other federal basis for jurisdiction.

participate in any unlawful conduct. Additionally, Defendant leans on what this Court has already determined are legitimate non-retaliatory reasons for Plaintiff's discharge.

"[A]n employee may bring a cause of action for termination of an at-will employment relationship where the termination implicates a *clear mandate of public policy*." *Eaves-Voyles v. Almost Fam., Inc.*, 198 F. Supp. 3d 403, 410 (M.D. Pa. 2016) (emphasis added). Pennsylvania courts have recognized that the public policy must be expressly regained in legislation, regulation, or judicial decisions. *Id.* This exception to the at-will employment relationship is limited to circumstances where the employer: (1) requires an employee to commit a crime; (2) prevents and employee from complying with a statutorily imposed duty; or (3) discharges an employee when specifically prohibited from doing so by statute. *Brennan v. Cephalon, Inc.*, 298 F. App'x 147, 150 (3d Cir. 2008).

Plaintiff's briefing makes zero argument that she was requested to participate in any illegal acts. In her response, Plaintiff has heaved more than a page of single-spaced bullet pointed regulations in her opposition brief related to the legal obligations of nurses in the Commonwealth. *See* Pl.'s Br. in Opp'n 10-12. Plaintiff has never claimed to be a nurse. As such, these regulations plainly do not apply to her. It is also not clear that the nurses at RHD were breaking the law or violating any public policy. Even if they were, Plaintiff has not articulated how she would have been required to participate in that scheme. RHD did not require or request that *Plaintiff* commit any crime. Finally, and most critically, Plaintiff was discharge for

legitimate non-retaliatory reasons detailed above.  Accordingly, RHD is entitled to summary judgment Claim 10.[12]

### k. Wage Payment and Collection Claim

Finally, Count 11 of Plaintiff's Amended Complaint asserts that RHD failed to pay a $1000 portion of a sign-on bonus she was promised, that RHD failed to pay her for accrued but unused paid time off upon her termination, and that it also failed to pay her for her last week of employment.  *See* Pl.'s Am. Compl. at ¶¶ 156-163.  There may be legitimate issues of fact with respect to whether Plaintiff was paid all that she was owed upon her departure.  On this claim, which the Court notes is untethered to the reason Plaintiff was actually terminated, the record is not wholly clear.

This Court is unwilling to exercise supplemental jurisdiction over what is certainly a meaningful amount of money to Plaintiff, but what amounts to an arbitration level dispute.  *See generally Hedges v. Musco*, 204 F.3d 109 (district courts may decline to exercise supplemental jurisdiction over claims after the dismissal of all claims over which the court had original jurisdiction.).  If Plaintiff so chooses, she may bring this cause of action in state court pursuant to 28 U.S.C. § 1367(d).

## V.    Conclusion

The Court wishes to emphasize that the outcome of this matter was not born out of malice or frustration with the Plaintiff's stated experience.  It is clear from the record that her co-workers probably harbored some poor feelings for Plaintiff.  They were likely unkind, and Plaintiff was likely not the best social fit for Defendant's

---

[12]    *See* nn. 7, 10, *supra*.

organization.  But non-discrimination statutes do not codify a general code of civility and Plaintiff simply could not prove, based on this record, that any invidious discrimination took place.  What this matter makes clear is the cautionary tale in that in a borderline case, the parties would do well to focus on their best arguments – taking an acute and sharpened approach, as opposed to a broad one.

For the foregoing reasons all of Plaintiff's claims except for her wage payment and collection claim are dismissed with prejudice.  An appropriate Order will follow.

BY THE COURT:

_____

GAIL A. WEILHEIMER,  J.

Dated:  2/2/26